UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

------------------------------------------------------
:
JOE W. LUMPKIN, : CASE NO. 1:16-CV-2751
:
Plaintiff, :
:
vs. : OPINION & ORDER
: [Resolving Doc. 17]
ADALET/SCOTT FETZER CO., :
:
Defendant. :
:
------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

On November 11, 2016, Plaintiff Joe W. Lumpkin filed Title VII employment discrimination claims against Defendant Adalet/Scott Fetzer Company.[1] Lumpkin claims Defendant unlawfully terminated him due to his race and subjected him to a hostile work environment.

On April 17, 2017, Defendant filed a motion for summary judgment.[2] For the reasons below, this Court **DENIES the** Defendant's motion for summary judgment.

### I. BACKGROUND

Defendant Adalet/Scott Fetzer Company ("Adalet") fired Plaintiff Joe Lumpkin. This case stems from Lumpkin's termination from Adalet. Defendant argues it fired Plaintiff for taking unauthorized smoke breaks in a non-smoking area. Plaintiff, an African American, argues that his Caucasian coworkers did the same and suffered no consequences.

---

[1] Doc. 1. Defendant answered. Doc. 4.
[2] Doc. 17. Plaintiff opposes. Doc. 22. Defendant replies. Doc. 23.

Case No. 1:16-CV-2751
Gwin, J.

On July 16, 2014, Defendant Adalet hired Plaintiff Lumpkin as a foundry custodian.[3] Lumpkin primarily reported to Foundry Supervisor Mark Ambrose, a Caucasian.[4]

During orientation, Defendant told Lumpkin of its Progressive Discipline Policy.[5] The policy states that "[a]ny employee who accumulates four demerits for any combination of violations [of policies or shop rules] within any twelve-month period will be terminated."[6]

Adalet work rule violations include "[i]ncurring more than two incidents of leaving work early or arriving late, or losing over four lost work time hours due to arriving late or leaving early in any one month period."[7] Further, "[a]rriving late and leaving early in the same day count as two different incidents."[8] "Failure to deliver a productive effort" is also against company policy.[9]

Defendant Adalet also informed Lumpkin of its anti-harassment and discrimination policies.[10] This policy directs employees to bring harassment complaints to a supervisor or human resources "immediately."[11] Plaintiff Lumpkin acknowledges receiving these policies.[12]

Relatedly, Plaintiff's Supervisor Mark Ambrose received training on "recognizing and preventing racial harassment in the workplace."[13] Supervisors are required to report racial harassment when they witness it.[14]

---

[3] Doc. 1 at 2; Doc. 17 at 2.
[4] *See* Doc. 1 at 2; Doc. 17 at 2. When Lumpkin was hired, the foundry employed thirty-one hourly employees, including thirteen African-Americans and seven Hispanic employees. *Id*.
[5] Doc. 16-1 at 80-91 (Plaintiff admitting he received Defendant's handbook, which included the discipline policy).
[6] Doc. 18-4 at 23.
[7] *Id.* at 24.
[8] Doc. 18-7 at 55 (Collective Bargaining Agreement Letter of Understanding #12).
[9] *Id*.
[10] Doc. 18-4 at 7 (equal opportunity employment policy), *id*. at 25 (anti-harassment policy).
[11] *Id*. at 26.
[12] Doc. 18-5 (Ex. 5, Plaintiff Lumpkin's employee confirmation of receipt of employee manual); Doc. 16-1 at 80-102 (deposition acknowledgment of receiving policies).
[13] Doc. 21-1 at 27-28 (deposition transcript of Adalet HR Manager Bonetta DuBreuil).
[14] Doc. 21-1 at 76-77.

Case No. 1:16-CV-2751
Gwin, J.

*Harassment Allegations*

Plaintiff Lumpkin says coworkers and supervisors called him racist nicknames and made derogatory comments toward him at work. He alleges Caucasian supervisors told him "you clean up real good," "clean that shit up," and "you've got to get that fucking sand up."[15]

Supervisor Ambrose called Lumpkin "Joe Dirt" and "Smoking Joe."[16] Another supervisor called him "Coolio."[17] Coworkers called him "Michael Jackson," "Cheeto-head," "Django," and "Goldie the Mack," among other names.[18]

Plaintiff Lumpkin claims Supervisor Ambrose witnessed Caucasian coworkers laughing at Lumpkin and did not intervene.[19] Although Plaintiff Lumpkin never formally reported these comments, he "went to" supervisor Ambrose about them.[20] Plaintiff states that Ambrose previously told him that "[w]hatever happens in the foundry stays in the foundry."[21]

*Demerits*

In early-mid October 2014, Plaintiff committed two attendance violations.[22] Then, on October 31, 2014, he both arrived late and left work early.[23] Lumpkin therefore "[i]ncurr[ed] more than two incidents of leaving work early or arriving late . . . in any one month period."[24]

Accordingly, on November 5, 2014, Defendant assessed Plaintiff for two demerits.[25]

---

[15] Doc. 1 at 3.
[16] *Id*.; Doc. 16-1 at 186-88.
[17] *Id*. at 184.
[18] *Id*. at 192-96, 205-06; Doc. 22 at 1-2. The names reference Plaintiff's hair texture and style (Cheeto-head) and African-American characters from popular culture (Michael, Tito, and Jermain Jackson, Smoking Joe, Coolio, Joe Dirt, Goldie the Mack). One name references slavery and brutal treatment of African-Americans (Django).
[19] Doc. 22 at 2-3. Plaintiff also states he was assigned work that would "ordinarily have about five people" dedicated to it. *Id*. at 6. Specifically, Plaintiff had to shovel sand at "waist high levels," which is outside his normal duties of shoveling sand in the foundry. Doc. 22-1 (affidavit of Plaintiff's coworker Michael Simpson).
[20] Doc. 16-1 at 170-72, 188-90. Plaintiff states that it would have been a "very hostile environment if [he] would have said anything." *Id*. at 171.
[21] *Id*. at 188-90.
[22] Doc. 18-10 (noting attendance violations on October 1 and October 7).
[23] *Id*.
[24] Doc. 18-4 at 24 (Rule 3(b)).
[25] Doc. 18-10. Plaintiff signed these demerits. *Id*. In his deposition, Plaintiff stated he did not believe the demerits stemmed from animus. Doc. 16-1 at 120-21.

Case No. 1:16-CV-2751
Gwin, J.

On April 2, 2015, Plaintiff received two more demerits for smoking in a non-smoking area while on the clock.[26] On that morning, Director of Operations Tom James saw Plaintiff and his African-American coworker Michael Simpson smoking in a non-smoking area.[27]

Plaintiff states that Caucasian coworkers were similarly smoking with him and. Simpson.[28] Defendant states that none of the white co-workers could have been smoking with Plaintiff on that day because they were off work or no longer employed by Adalet.[29]

After Operations Director James saw Plaintiff and Simpson smoking, James emailed Supervisor Ambrose and told Ambrose to issue Plaintiff and Simpson demerits.[30] James saw Plaintiff smoking again in the same area later that afternoon.[31]

Because these demerits brought Plaintiff to a total of four infractions within twelve months, Defendant Adalet terminated Plaintiff on April 7, 2015.[32]

*Procedural History*

The day Defendant terminated Plaintiff Lumpkin, the Union filed a grievance on Lumpkin's behalf.[33] The grievance was denied on April 13, 2015.[34]

In May 2015, Lumpkin filed a complaint with the Equal Employment Opportunity Commission ("EEOC"). On August 15, 2016, the EEOC issued Lumpkin a right to sue letter.[35]

On November 11, 2016, Lumpkin filed Title VII employment discrimination and related

---

[26] Doc. 18-10 at 2. The forms state that Lumpkin violated Rule 3(e), failure to deliver a productive effort. Plaintiff Lumpkin acknowledges that these final demerits were for smoking in a nonsmoking area. Doc. 16-1 at 131-33.
[27] *Id*. at 135.
[28] *Id*. at 57-59 (naming "Bryan Zimmerman, Matt, Denny, Michael Simpson, and Jeff"); Doc. 22-1 at 3-4 (affidavit of Plaintiff's coworker Michael Simpson) (stating three Caucasian employees were smoking with them).
[29] Doc. 17-5 (stating that on April 2, 2015, Bryan Zimmerman was on holiday, Jeff Warner did not clock in until 1:46 PM, and Dennie Miller was not at work because he was previously fired).
[30] Plaintiff claims Ambrose was at work that day. Defendant states Ambrose was on vacation. *Compare* Doc. 17 at 5 *with* Doc. 16-1 at 135.
[31] Doc. 16-1 at 152-53.
[32] Doc. 18-15. No one interviewed Plaintiff Lumpkin about the incident before terminating him. Doc. 21-1 at 85.
[33] Doc. 18-16.
[34] *Id*.
[35] Doc. 1-1.

4

state claims against Defendant Adalet in this Court.[36]

On April 17, 2017, Defendant filed a motion for summary judgment.[37]

## II.     LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, "[s]ummary judgment is proper when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"[38] The moving party must first demonstrate that there is an absence of a genuine dispute as to a material fact entitling it to judgment.[39] Once the moving party has done so, the non-moving party must set forth specific facts in the record—not its allegations or denials in pleadings—showing a triable issue.[40] The existence of some doubt as to the material facts is insufficient to defeat a motion for summary judgment.[41] But the Court views the facts and all reasonable inferences from those facts in favor of the non-moving party.[42]

When parties present competing versions of the facts on summary judgment, a district court adopts the non-movant's version of the facts unless the record before the court directly contradicts them.[43] Otherwise, a district court does not weigh competing evidence or make credibility determinations.[44]

---

[36] Doc. 1. Defendant answered. Doc. 4.
[37] Doc. 17. Plaintiff opposes. Doc. 22. Defendant replies. Doc. 23.
[38] *Killion v. KeHE Distribs., LLC*, 761 F.3d 574, 580 (6th Cir. 2014) (quoting Fed. R. Civ. Pro. 56(a)).
[39] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).
[40] *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).
[41] *Id.* at 586.
[42] *Killion*, 761 F.3d at 580 (internal citation omitted).
[43] *See Scott v. Harris*, 550 U.S. 372, 380 (2007).
[44] *Koren v. Ohio Bell Tel. Co.*, 894 F. Supp. 2d 1032, 1037 (N.D. Ohio 2012) (citing *V & M Star Steel v. Centimark Corp.*, 678 F.3d 459, 470 (6th Cir. 2012)).

Case No. 1:16-CV-2751
Gwin, J.

### III.  DISCUSSION

#### A. Termination Claim

Plaintiffs brings both a federal Title VII claim and an Ohio claim for wrongful termination under Ohio Revised Code §4112.02. Because the federal analysis is also used for the state claim,[45] the Court analyzes them together under the federal framework.

Under Title VII, an employer may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."[46]

To survive summary judgment, Plaintiff Lumpkin must first make out a prima facie case of race discrimination.[47] To establish a prima facie case, Lumpkin must show that: "1) he is a member of a protected class; 2) [he] was qualified for the job; 3) he suffered an adverse employment decision; and 4) [he] was replaced by a person outside the protected class or treated differently than similarly non-protected employees."[48]

If Plaintiff makes out a prima facie case, the burden shifts to Defendant Adalet "to proffer a legitimate, nondiscriminatory reason for its decision."[49] If Defendant carries its burden, Plaintiff Lumpkin "must then prove by a preponderance of the evidence that the reasons offered by the employer were pretextual."[50]

---

[45] *Arnold v. City of Columbus*, 515 F. App'x 524, 529 (6th Cir. 2013) (citing *Staunch v. Cont'l Airlines, Inc.*, 511 F.3d 625, 631 (6th Cir. 2008); *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 421 N.E.2d 128, 131 (Ohio 1981)).
[46] 42 U.S.C. § 2000e–2(a)(1).
[47] *Arnold*, 515 F. Appx'x at 530 (citing *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 584 (6th Cir. 2009)).
[48] *Id*. (citing *Newman v. Fed. Express Corp.*, 266 F.3d 401, 406 (6th Cir. 2001)).
[49] *Id*. (citing *Upshaw*, 576 F.3d at 584 ).
[50] *Id.*

6

### 1. Prima Facie Case

The parties only dispute whether Plaintiff satisfies the fourth prong.[51] Because Defendant did not replace Plaintiff's position after Plaintiff was terminated,[52] Plaintiff must show he was "treated differently than similarly non-protected employees."

Defendant argues that Plaintiff fails to show disparate treatment.[53] Specifically, Defendant states that "at least three non-African American employees have received demerits . . . for smoking outside of their break time or for smoking in non-smoking areas."[54]

Plaintiff responds that there is no supporting documentation for these alleged demerits and Caucasian coworkers were never written up.[55] Plaintiff also points to HR Manager Bonetta DuBreuil's testimony that Supervisor Ambrose had not previously written up foundry employees for smoking in the courtyard before writing up Plaintiff at Tom James' direction.[56]

The Court finds a genuine dispute as to whether non-African American employees have been reprimanded for smoking violations. DuBreuil's affidavit generally says that three non-African American employees were cited for smoking outside break time. But she does not give their names and gives no further evidence supports that statement.[57] A jury should consider the competing testimony.

---

[51] Doc. 17 at 9. Defendant concedes that Plaintiff Lumpkin is a member of a protected class and suffered an adverse employment action. Defendant does not appear to dispute the second prong either. *See id*.
[52] *Id*.
[53] *Id*.
[54] *Id*. at 10 (citing Doc. 17-5).
[55] Doc. 22 at 16.
[56] *Id.* (citing Doc. 21-1 at 89-90) (DuBreuil stating that Mark Ambrose had not written up foundry employees for smoking in the courtyard before April 2015). Plaintiff also argues that Defendant improperly assumed Supervisor Ambrose was uniformly applying company policy rather than according to an employee's race. Doc. 22 at 14 (citing Doc. 21-1 at 35-39, deposition of Bonetta DeBreuil). Defendant responds that no further investigation into Plaintiff's demerits was warranted—"[t]he issuance of two demerits and the resulting termination was uncomplicated." Doc. 23 at 11. The Court agrees—Defendant had no reason to investigate Plaintiff's citations more thoroughly at the time. Plaintiff had never formally complained of discrimination to human resources. Doc. 16-1 at 170-72, 188-90.
[57] Doc. 17-5.

Case No. 1:16-CV-2751
Gwin, J.

The Court acknowledges that some doubt exists as to Plaintiff's story. Plaintiff states that Caucasian coworkers were smoking with him and Mr. Simpson the morning of April 2, 2015 and did not receive demerits.[58] Defendant argues that none of those individuals were with Plaintiff on that day because they were either off work or no longer employed by Adalet.[59]

Defendant's argument is supported by the record—three of the four individuals alleged to be smoking with Plaintiff and Simpson could not have been there on that particular morning.[60]

However, even if those employees were not with Plaintiff on the morning in question, Plaintiff states that Caucasian coworkers and Supervisor Mark Ambrose regularly smoked outside formal break times.[61] Ambrose even offered Lumpkin cigarettes.[62] If that is true—and Defendant submits no evidence suggesting it is not—Ambrose repeatedly witnessed violations of company policy without issuing demerits.

Whether Defendant Adalet fired Plaintiff Lumpkin for smoking during non-break times and allowed Caucasian coworkers to do the same with no consequences is a question for trial.

**2. Nondiscriminatory Motive and Pretext**

Because Plaintiff shows genuine disputes of material fact in his prima facie case, Defendant must show a nondiscriminatory reason for firing Lumpkin. Plaintiff Lumpkin violated

---

[58] Doc. 16-1 at 57-59 (naming "Bryan Zimmerman, Matt, Denny, Michael Simpson, and Jeff"); Doc. 22-1 at 3-4 (affidavit of Plaintiff's coworker Michael Simpson) (stating three Caucasian employees were smoking with them).
[59] Doc. 17 at 10 (citing Doc. 17-5) (declaration of Bonetta DuBreuil).
[60] Doc. 17-5 at 3-5 (employment records showing that on April 2, 2015, Bryan Zimmerman was on holiday, Jeff Warner did not clock in until 1:46 PM, and Dennie Miller was not at work because he was fired two and a half months earlier).
[61] Doc. 22 at 10-12 (citing Doc. 22-1 at 4-5, affidavit of Plaintiff's coworker Michael Simpson).
[62] *Id*.

Case No. 1:16-CV-2751
Gwin, J.

Defendant's progressive disciplinary policy[63]—a policy that Lumpkin acknowledges receiving.[64] This violation is a nondiscriminatory motivation for firing Lumpkin.

Plaintiff therefore has the burden of proving "by a preponderance of the evidence that the reasons offered by the employer were pretextual."[65]

A plaintiff can establish pretext by showing "(1) that the proffered reasons had no basis *in fact,* (2) that the proffered reasons did not *actually* motivate his [discipline], or (3) that they were *insufficient* to motivate discharge."[66]

"The third category of pretext consists of evidence that other employees, particularly employees outside the protected class, were not disciplined even though they engaged in substantially identical conduct to that which the employer contends motivated its discipline of the plaintiff."[67] This case fits into the third category.

If Plaintiff Lumpkin makes a showing under the third category, the Court can but is not required "to infer illegal discrimination from the plaintiff's prima facie case."[68] "In other words, it creates a genuine, triable issue of material fact."[69]

As discussed above, whether employees "outside the protected class" were disciplined for smoking outside of break time or in a non-smoking area is unclear—neither side presents hard evidence. Therefore, a genuine issue of material fact exists.

---

[63] Adalet policy states that "[a]ny employee who accumulates four demerits for any combination of violations [of Adalet policies or shop rules] within any twelve-month period will be terminated." Doc. 18-4 at 23. Plaintiff's late arrival and early departure on October 31, 2014 and two smoking violations on April 2, 2015 (Doc. 18-10) amount to four demerits within twelve months.
[64] Doc. 18-5 (Ex. 5, Plaintiff Lumpkin's employee confirmation of receipt of employee manual); Doc. 16-1 at 80-102 (deposition acknowledgment of receiving policies).
[65] *Arnold*, 515 F. App'x at 530 (citing *Upshaw*, 576 F.3d at 584).
[66] *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 349 (6th Cir. 2012) (quoting *Manzer v. Diamond Shamrock Chemicals. Co.,* 29 F.3d 1078, 1084 (6th Cir. 1994)) (emphasis in original).
[67] *Id*.
[68] *Id*.
[69] *Id*.

9

Case No. 1:16-CV-2751
Gwin, J.

However, Plaintiff must also establish that a racially-motivated actor was "the decision maker with regard to the relevant adverse employment action."[70]

Plaintiff Lumpkin argues that Supervisor Ambrose demonstrated racial animus by calling Lumpkin racial nicknames like "Smoking Joe" and tolerating other employees doing the same.[71] Further, Ambrose "wrote and signed the write-up for the two demerits in one day against Mr. Lumpkin resulting in his termination."[72]

Defendant argues that Ambrose's involvement in Plaintiff's termination is insufficient. Director of Operations Tom James saw Plaintiff smoking and ordered Ambrose to write the demerits. Defendant reasons that James was the relevant decision maker.[73]

While it is a close call, the Court finds that Ambrose was sufficiently involved in Plaintiff's termination. James witnessed Plaintiff smoking and ordered Ambrose to write the demerits. However, Plaintiff has suggested that Ambrose often smoked with Plaintiff during non-break times and encouraged employees to do so.[74] If that is true, Ambrose could have told James that the rule was not regularly enforced. Ambrose is sufficiently implicated in the decision to fire Plaintiff Lumpkin.

Accordingly, the Court **DENIES** summary judgment on Plaintiff's termination claim.

---

[70] *Id*. at 350.
[71] Doc. 22 at 18.
[72] *Id*; Doc. 19-6 (disciplinary forms showing Ambrose's signature).
[73] Doc. 23 at 3-4.
[74] Doc. 22-1 at 2-5 (affidavit of Plaintiff's coworker Michael Simpson) ("[Plaintiff and others were smoking] during a time when there was a pause in the activity of the work that gave an opportunity to get outside for fresh air from the heat that was inside the foundry. Taking breaks to go outside and smoke in the courtyard was allowed and encouraged by our Supervisor Mark Ambrose . . . . Many of the employees, including Caucasian employees and our supervisor Mark Ambrose would smoke in the courtyard at these times . . . There were times that Mark Ambrose would give cigarettes to [Plaintiff Lumpkin] and [Michael Simpson] to smoke out in the courtyard, even though it was not a scheduled break time by the whistle.").

## B. Hostile Work Environment Claim

Defendant Adalet argues that Plaintiff's hostile work environment claim fails.[75]

To show a hostile work environment, "a plaintiff must demonstrate that (1) he belonged to a protected group, (2) he was subject to unwelcome harassment, (3) the harassment was based on race, (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, and (5) the defendant knew or should have known about the harassment and failed to act."[76]

The fourth and fifth factors are disputed here.

### 1. Severe or Pervasive

To discern whether comments are "sufficiently severe," courts consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."[77] "[O]nly harassment *based on the plaintiff's race* may be considered."[78]

In the Sixth Circuit, even where comments are "socially repulsive," "deporable" and racially-charged, they do not create a hostile work environment if they are "too infrequently made" and "neither physically threatening nor humiliating."[79] Further, when "there is no

---

[75] Defendant argues that the complaint alludes to but does not specifically plead this claim. The complaint was sufficiently specific to include a hostile work environment claim. Doc. 1 at 3 ("Adalet's racial discrimination and harassment created a hostile work environment . . . .").

[76] *Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011) (citing *Moore v. KUKA Welding Sys. & Robot Corp.,* 171 F.3d 1073, 1078–79 (6th Cir. 1999)). To the extent Plaintiff Lumpkin also brings an Ohio hostile work environment claim, the same analysis applies. *See Gallagher v. C.H. Robinson Worldwide, Inc*., 567 F.3d 263, 270 (6th Cir. 2009).

[77] *Williams*, 643 F.3d at 512 (citing *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23 (1993)).

[78] *Id*. at 511 (citing *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 464 (6th Cir. 2000)) (emphasis in original). The Court does not consider the nickname "Joe Dirt" because it does not seem to relate to Plaintiff's race. Joe Dirt is a Caucasian movie character. Plaintiff stated in his deposition that "Joe Dirt" offended him because it suggested he was "dirty." Doc. 16-1 at 204-05. But Plaintiff does not appear to find this particular insult racially charged. *See* Doc. 1 at 3 (providing no racially-based explanation for this nickname where explanations were provided for nicknames like "Django" and "Cheeto-head").

[79] *Wade v. Automation Pers. Servs., Inc.*, 612 F. App'x 291, 298 (6th Cir. 2015) (finding no hostile work environment where "two racist encounters" involving "socially deplorable" nicknames from the movie *The Help* were "neither physically threatening nor humiliating").

evidence that the comments unreasonably interfered with [Plaintiff's] work performance," the Sixth Circuit has "repeatedly recognized that 'occasional . . . offensive utterances' do not rise to the level required to create a hostile work environment."[80]

Defendant argues that nicknames, however offensive, do not generally create a hostile work environment.[81] For example, Defendant argues that "Smoking Joe" is not offensive—taken literally, Plaintiff's name is Joe, and he smokes.[82] Furthermore, "Smoking Joe" alludes to Joe Frazier, a well-respected African American athlete.[83]

Defendant does not appear to dispute that certain nicknames, such as "Django" or "Coolio," are racially charged and at least potentially offensive.[84] Instead, Defendant argues that these nicknames were so infrequently used—"Django" and "Cheeto-head" twice, "Coolio" once—that any harassment was not severe or pervasive.[85]

Plaintiff argues that "an ordinary reasonable person would find the pervasive ridiculing [Plaintiff suffered] to be abusive."[86]

Here, nearly all[87] of the nicknames used for Plaintiff Lumpkin are racially charged—they refer to Plaintiff's identity as an African-American. Calling Lumpkin "Django" is offensive— "Django" refers to the eponymous character in the 2012 film depicting a freed slave's attempt to

---

[80] *Id*. at 299 (citing *Grace v. USCAR*, 521 F.3d 655, 679 (6th Cir. 2008)).
[81] Doc. 17 at 14.
[82] Doc. 16-1 at 186.
[83] *Id*.
[84] *See* Doc. 17 at 15-16. Defendant argues that there is no evidence "the nickname 'Cheeto-head' is in any way related to Plaintiff's race." But Plaintiff's complaint makes clear the nickname refers to his African-American hairstyle. Doc. 1 at 3.
[85] *Id*. (citing Doc. 16-1 at 184-85, 195, 205-06) (Plaintiff Lumpkin stating that he was called Django "a couple times," Cheeto-head "a couple of times," and Coolio "one time").
[86] Doc. 22 at 18.
[87] *See supra* at 11 n.81.

free his enslaved wife.[88] The movie involves patently offensive language and violence against African-Americans.[89]

While the parties may bicker over whether "Smoking Joe" is a compliment or an insult, it is clear that nicknames used for Plaintiff Lumpkin were associated with his race.

While some nicknames were only used a few times,[90] others were more frequent. For example, Plaintiff states he was called "Michael Jackson" approximately "20 times a day" while he was temping at Adalet.[91] Supervisor Ambrose called Lumpkin "Smokin Joe" "[e]very day [Ambrose] saw [Lumpkin], any chance [Ambrose] g[o]t."[92] Plaintiff testifies that he felt humiliated upon hearing these nicknames and his Caucasian coworkers' laughter.[93]

This case presents a close question. Although the Sixth Circuit sets a "relatively high bar"[94] for showing a hostile work environment, the Court holds that Plaintiff experienced racially charged nicknames frequently enough to present a genuine issue of material fact.

Furthermore, Plaintiff's claim should proceed to trial for practical purposes. Because the wrongful termination claim will be submitted to a jury, it is more efficient for the jury to consider the case in its entirety.

### 2. Defendant's Knowledge

Under the fifth prong, "an employer's liability . . . may depend on the status of the harasser." The Supreme Court has held:

> If the harassing employee is the victim's co-worker, the employer is liable only if
> it was negligent in controlling working conditions. In cases in which the harasser
> is a 'supervisor,' however, different rules apply. If the supervisor's harassment

---

[88] Internet Movie Data Base, *Django Unchained*, http://www.imdb.com/title/tt1853728/.
[89] The New Yorker, *Tarantino Unchained*, http://www newyorker.com/culture/culture-desk/tarantino-unchained.
[90] Doc. 17 at 15-16 (citing Doc. 16-1 at 184-85, 195, 205-06).
[91] Doc. 16-1 at 192-193.
[92] *Id.* at 187-88.
[93] *Id.* at 185, 196.
[94] *Phillips v. UAW Int'l*, 854 F.3d 323 (6th Cir. 2017) (collecting cases where—despite severely offensive comments and gestures—the "severe and pervasive" standard was not met).

culminates in a tangible employment action, the employer is strictly liable. But if no tangible employment action is taken, the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided.[95]

### *Coworker Harassment*

Defendant Adalet argues that it is not liable for harassment from Lumpkin's coworkers[96] because Adalet did not know about the comments and fail to take action.[97]

Plaintiff states that he "went to" Supervisor Ambrose but never reported any of these incidents.[98] However, Plaintiff also states that Ambrose witnessed much of the name calling.[99]

"An employer is deemed to have notice of harassment reported to any supervisor or department head who has been authorized—or is reasonably believed by a complaining employee to have been authorized—to receive and respond to or forward such complaints to management."[100]

Supervisor Ambrose was charged with reporting harassment to management.[101] Whether Ambrose had knowledge of name calling by Lumpkin's coworkers is a material fact for the jury to decide. If Ambrose had knowledge, his knowledge may be imputed to Defendant Adalet.

Because there is a genuine dispute over whether Defendant negligently failed to address coworkers' racially charged nicknames, Defendant's motion for summary judgment is **DENIED** for this claim.

---

[95] *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2439 (2013) (citing *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 807 (1998); *Faragher v. Boca Raton,* 524 U.S. 775,765 (1998)).
[96] Only Mark Ambrose, who called Lumpkin "Smoking Joe," is a supervisor.
[97] Doc. 17 at 17-18.
[98] Doc. 16-1 at 170-72, 188-90.
[99] Doc. 22 at 2-3 (citing Doc. 22-1 at 2) ("[T]he Caucasian employees would call out 'Here comes Jermaine Jackson!' and they would start laughing out loud when [Plaintiff Lumpkin] walked into the meeting. This happened multiple times in front of Mark Ambrose and Mark Ambrose never told them to stop doing it.").
[100] *Gallagher*, 567 F.3d at 277 (citing *Bombaci v. Journal Community Pub. Group. Inc.,* 482 F.3d 979, 984 (7th Cir. 2007)).
[101] Doc. 21-1 at 76-77.

Case No. 1:16-CV-2751
Gwin, J.

*Supervisor Harassment*

Defendant Adalet also argues it is not responsible for Supervisor Ambrose's comments. Defendant states that Ambrose was not involved in Lumpkin's termination except for preparing the written demerits at Director of Operations Tom James' order.[102]

Plaintiff responds that Ambrose's preparation of the demerits is sufficient involvement in Lumpkin's termination.[103] The Court agrees.

As discussed above, evidence suggests Ambrose repeatedly allowed and participated in smoking outside break time. When James contacted Ambrose to complain about Lumpkin's smoking, Ambrose should have clarified the situation.

Evidence also suggests Ambrose repeatedly directed racially-charged nicknames at Plaintiff and witnessed others do the same. Furthermore, Plaintiff submits that he "went to" Ambrose about the nicknames. Despite his obligation, Ambrose did not report the harassment.

Accordingly, there is sufficient evidence showing Supervisor Ambrose's harassment "culminated" in a tangible employment action.

Even if Supervisor Ambrose's harassment is not sufficiently tied to Plaintiff's termination, it is questionable whether Defendant Adalet can establish an affirmative defense.[104]

Adalet argues it took affirmative steps to prevent any harassment through its anti-discrimination and anti-harassment policies.[105]

---

[102] Doc. 17 at 18-19.
[103] Doc. 22 at 18.
[104] Defendant is not liable if "it establishes . . . that (a) it exercised reasonable care to prevent and correct promptly any [racially] harassing behavior, and (b) the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Rayford v. Illinois Cent. R.R.*, 489 F. App'x 1, 6 (6th Cir. 2012) (citing *Burlington Indus.*, 524 U.S. at 765) (internal quotations omitted).
[105] Doc. 17 at 18-19.

15

Case No. 1:16-CV-2751
Gwin, J.

Importantly, the policy says the victim is to "immediately bring the complaint to the attention of their Supervisor or the Human Resources Manager. Anyone uncomfortable with reporting a complaint of harassment to their Supervisor or the HR Manager needs to immediately report the complaint to the General Manager . . . Any Supervisor who learns of a complaint involving harassment is to notify the HR Manager immediately."[106]

While Plaintiff Lumpkin could have reported the situation to the General Manager if he was uncomfortable going to Supervisor Ambrose, Ambrose also had an ongoing duty to report harassment himself. Therefore, according to Plaintiff's version of events, there is some doubt that Defendant Adalet "exercised reasonable care to prevent and correct" harassing behavior.

Accordingly, the Court **DENIES** summary judgment on the supervisor portion of Plaintiff's hostile work environment claim.

### IV.    CONCLUSION

For the reasons above, this Court **DENIES** Defendant's motion for summary judgment.

IT IS SO ORDERED.

Dated: May 15, 2017                                              *s/       James S. Gwin*
                                                               JAMES S. GWIN
                                                               UNITED STATES DISTRICT JUDGE

---

[106] Doc. 18-4 at 25-26.